No. 98-489

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 241

296 Mont. 176

988 P.2d 782

AMERICAN AGRIJUSTERS CO.,

Petitioner and Respondent,

v.

MONTANA DEPARTMENT

OF LABOR AND INDUSTRY,

BOARD OF LABOR APPEALS,

and ROBERT GILMORE, JR.,

Respondent and Appellant.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Robert J. Campbell, Department of Labor and Industry, Helena, Montana

For Respondent:

Robert R. Throssell, Keller, Reynolds, Drake, Johnson & Gillespie, Helena, Montana; R. Laubenthal, Smith Peterson Law Firm, Council Bluffs, Iowa

Submitted on Briefs: March 18, 1999

Decided: October 14, 1999

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶ **The Montana Department of Labor and Industry (the Department) appeals from**

the order of the First Judicial District Court, Lewis and Clark County, reversing the decision of the Board of Labor Appeals (the Board), which had adopted the findings and affirmed the decision of the Department that Robert Gilmore, Jr. (Gilmore), and other similarly situated crop adjusters were employees of American Agrijusters Co. (Agrijusters). The District Court determined that Gilmore and similarly situated crop adjusters were independent contractors and, therefore, that Agrijusters was not liable for unpaid unemployment insurance tax contributions. We reverse.

¶ We restate the issue on appeal: Did the District Court correctly review the Board's findings of fact and apply § 39-51-201(14), MCA (1995), in determining that Gilmore and other similarly situated crop adjusters were independent contractors?

Factual and Procedural Background

¶ On June 1, 1992, Gilmore entered into an Independent Adjusters Agreement with Agrijusters, pursuant to which he was to provide crop adjusting services to Agrijusters for the ensuing crop season. Gilmore later quit because he was not receiving enough work. Thereafter, he filed a claim for unemployment insurance benefits with the Department but was told that Agrijusters did not report crop adjusters in the unemployment insurance program. The Unemployment Insurance Division of the Department determined, on December 15, 1992, that Gilmore and other similarly situated crop adjusters were employees of Agrijusters for unemployment insurance tax purposes.

¶ Agrijusters appealed that determination and a hearing on the merits of the dispute was held on October 3 and 4, 1995, before a Department Hearings Officer. On May 10, 1996, the Hearings Officer affirmed the prior determination, finding that the work which Gilmore and other similarly situated crop adjusters performed for Agrijusters constituted employment, and that Gilmore and similarly situated crop adjusters were not independent contractors.

¶ Agrijusters appealed the Hearings Officer's decision to the Board. The Board, in affirming the two prior determinations, again found employee and not independent contractor status for Gilmore and the other similarly situated crop adjusters. Agrijusters then filed a Petition for Judicial Review in the First Judicial District Court. On May 26, 1998, the District Court issued an order reversing the three prior administrative determinations and holding that Gilmore and similarly situated crop

adjusters were independent contractors.

¶ The Federal Crop Insurance Act, 7 U.S.C. §§ 1501-1520, was established in 1938 to improve the economic stability of American agriculture by providing a sound system of crop insurance. Pursuant to the Act, the Federal Crop Insurance Corporation (FCIC) was established to promulgate regulations and enter into agreements to reinsure crop insurance contracts between producers and private insurance companies. Redland Insurance Company has a Standard Reinsurance Agreement with the FCIC to reinsure crop insurance contracts. Under the reinsurance agreement, FCIC adjustment procedures and methods must be followed by Redland Insurance Company and its subsidiaries. Agrijusters, a subsidiary of Redland Insurance Company, provides crop adjusters to service loss claims under multiple peril crop insurance policies.

¶ Agrijusters contracts with crop adjusters to perform crop insurance adjusting in the field. The individual crop adjusters are hired on an "as needed" basis. Each adjuster signs an Independent Adjusters Agreement. Crop adjusters may be either experienced adjusters or inexperienced trainees. Many of the crop adjusters that Agrijusters contracts with are inexperienced at adjusting claims. Gilmore had no prior experience as a crop adjuster and knew nothing about the adjusting trade prior to contracting with Agrijusters.

¶ Trainee crop adjusters are provided with both classroom and on-the-job training and supervision by experienced adjusters until they master the adjusting procedures required by federal regulations. Trainees must successfully complete both classroom and on-the-job training before they are permitted to adjust crop damage on their own without an experienced adjuster monitoring their performance. Both experienced and trainee crop adjusters must also complete ongoing education required by the FCIC, to remain current on changes in industry procedures and company policies. Gilmore's separation from Agrijusters occurred during the training stages of the work relationship.

¶ Crop adjusters are compensated at a daily rate as individually specified in each Independent Adjusters Agreement. Agrijusters also reimburses individual adjusters for reasonable and necessary expenses, including meals, lodging, mileage, maps, postage, and telephone calls. However, individual adjusters are responsible for all office and secretarial expenses, transportation, vehicle maintenance and repair, and

automobile liability insurance. Beginning in 1995, individual adjusters were also required to pay for formal classroom training; however, Agrijusters provides adjusters who successfully pass the tests with a signing bonus of $500 to $700 for agreeing to provide adjusting services to Agrijusters for the ensuing crop season. Gilmore attended two training sessions which were paid for by Agrijusters, and was also reimbursed for the expenses of attending such training.

¶ The equipment necessary to crop adjust is minimal and the majority of individual adjusters furnish their own equipment. However, some of the adjusters lease their equipment through Agrijusters, which provides tools such as a calculator, a grain-measuring scale, a wheel measurer, and/or a tape measurer to these adjusters for a nominal annual fee. Crop adjusters must also purchase a standardized FCIC crop adjusting manual for a nominal fee. Adjusters are required to complete their assessments on standardized FCIC claim forms provided by Agrijusters.

¶ Individual crop adjusters are responsible for scheduling and performing their duties. Adjusters are not required to work set hours. Nor are adjusters required to file periodic progress reports with Agrijusters; they must only file a completed policy report, containing the results of the adjuster's crop assessment, when the job assignment is completed. Crop adjustment assignments are to be completed by adjusters in a "reasonable time," preferably as quickly as possible. Adjusters submit their crop adjustments to Agrijusters for review. If the adjustment was completed incorrectly and needed to be reworked by the adjuster, then Agrijusters would pay that adjuster for the time required to revise the adjustment. If the original adjuster was not available, another adjuster would be asked to revise the adjustment.

¶ Under a standard provision in each Independent Adjusters Agreement, either party could terminate the relationship for any reason and without cause by giving the other party ten days written notice. Because of the uncertainty of various conditions affecting the crop growing season, most adjusters do not work full-time adjusting crop damage and many adjusters have other primary occupations such as ranching, farming, real estate sales, teaching school, selling insurance, and so on. Under the Independent Adjusters Agreement, individual adjusters retain the right to perform crop adjusting services for other entities. Approximately seventy to eighty percent of the crop adjusters who contract with Agrijusters perform crop adjusting services for other companies. Gilmore did not have an independently established business, crop adjusting or otherwise, during the time that he was under contract

**with Agrijusters.**

Discussion

**¶ Did the District Court correctly review the Board's findings of fact and apply § 39-51-201(14), MCA (1995), in determining that Gilmore and other similarly situated crop adjusters were independent contractors?**

**¶ A district court's review of a decision by the Board, rather than being governed by the Montana Administrative Procedure Act, is circumscribed by § 39-51-2410(5), MCA. Thomas Bros. v. Cargill, Inc. (1996), 276 Mont. 105, 108-09, 915 P.2d 226, 228. Section 39-51-2410(5), MCA, sets forth the applicable standard of review of a Board decision:**

> In any judicial proceeding under 39-51-2406 through 39-51-2410, the findings of the board as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive and the jurisdiction of said court shall be confined to questions of law. . . .

Section 39-51-2410(5), MCA.

**¶ The statutory phrase "supported by evidence" has been construed to mean supported by substantial evidence. Reynolds v. Pacific Telecom, Inc. (1993), 259 Mont. 309, 314, 856 P.2d 1365, 1368. Substantial evidence is "something more than a scintilla of evidence, but may be less than a preponderance of the evidence." Gypsy Highview Gathering Sys. Inc. v. Stokes (1986), 221 Mont. 11, 15, 716 P.2d 620, 623. On judicial review, the sole inquiry with respect to the evidence is " 'whether the findings are supported by substantial evidence, regardless of whether there is also substantial evidence or even a preponderance of evidence to the contrary.' " Gypsy Highview, 221 Mont. at 15, 716 P.2d at 623 (quoting Jordan v. Craighead (1943), 114 Mont. 337, 343, 136 P.2d 526, 528).**

**¶ Due to this deferential standard of review, it is impermissible, pursuant to § 39-51-2410(5), MCA, for a district court to "balance conflicting evidence in support of and in opposition to the Board's findings, determine which is the more substantial evidence, or consider where the preponderance of the evidence lies . . . ." Thomas Bros., 276 Mont. at 109, 915 P.2d at 228. Indeed, doing so would effectively nullify**

the "conclusive nature" of the Board's findings. Thomas Bros., 276 Mont. at 109, 915 P.2d at 228. This Court's review of a Board decision in unemployment compensation cases is governed by the same limited standard. Zimmer-Jackson Assocs., Inc. v. Department of Labor and Indus. (1988), 231 Mont. 357, 360, 752 P.2d 1095, 1097 (citing Gypsy Highview, 221 Mont. at 15, 716 P.2d at 623); see also § 39-51-2410(6), MCA.

¶ Since the Board adopted the findings of fact made by the Department's Hearings Officer, we will review those findings as if they were made by the Board. There is no allegation of fraud in this matter. Therefore, if the findings of the Board are supported by substantial evidence, then those findings are conclusive in nature and both the District Court's and this Court's jurisdiction is limited to the legal question of whether crop adjusters are employees or independent contractors for unemployment insurance tax purposes. We review a trial court's conclusion of law as to whether it is correct. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603.

¶ We determine, as discussed below, that the Board's findings are supported by substantial evidence, and are therefore conclusive and binding. In accord with this determination, we further conclude that the District Court erred in applying § 39-51-201(14), MCA (1995), and adjudging that Gilmore and other similarly situated crop adjusters were independent contractors.

¶ Section 39-51-201(14), MCA (1995), sets forth what has become commonly referred to as the "AB test":

> "Independent contractor" means an individual who renders service in the course of an occupation and:
>
> (a) has been and will continue to be free from control or direction over the performance of the services, both under a contract and in fact; and
>
> (b) is engaged in an independently established trade, occupation, profession, or business.

Section 39-51-201(14), MCA (1995).

¶ Because the statute utilizes the conjunctive "and" in the definition of "independent contractor," the absence of either the "A" or "B" portion of the test results in a conclusion of employment. Northwest Pub. v. Montana Dep't. of Labor and Indus. (1993), 256 Mont. 360, 363, 846 P.2d 1030, 1032. Therefore, Agrijusters must satisfy both prongs of the "AB test" in order to sustain its contention that Gilmore and other similarly situated crop adjusters are independent contractors. Since we conclude, for the reasons that follow, that Agrijusters has failed to establish the "A" (right of control) component of the test, we need not address whether the "B" (independently established business) part was met.

¶ In determining whether a right of control exists sufficient to give rise to an employer-employee relationship in a given situation, we have identified four factors that guide the inquiry: (1) direct evidence of right or exercise of control; (2) method of payment; (3) furnishing of equipment; and (4) right to fire. Sharp v. Hoerner Waldorf Corp. (1978), 178 Mont. 419, 425, 584 P.2d 1298, 1301-02 (citing 1A Arthur Larson, Workmen's Compensation Law § 44.31, at 8-35). These four factors do not constitute a balancing test. Rather, independent contractor status must be established by a convincing accumulation of evidence under the factors and other tests. However, employee status may be established on the strength of the evidence under one of the four factors standing alone. Sharp, 178 Mont. at 425, 584 P.2d at 1302 (quoting 1A Arthur Larson, Workmen's Compensation Law § 44.31, at 8-35). As the newest edition of Larson's treatise explains:

> [F]or the most part, any single factor is not merely indicative of, but, in practice, virtually proof of, the employment relation; while, in the opposite direction, contrary evidence is as to any one factor at best only mildly persuasive evidence of contractorship, and sometimes is of almost no such force at all.

3 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 61.04, at 61-7 (1999).

(1) Direct Evidence of Right or Exercise of Control

¶ Right of control, as we have repeatedly recognized, is the "most crucial factor" in distinguishing between employees and independent contractors. Standard Chem. Mfg. Co. v. Employment Sec. Div. (1980), 185 Mont. 241, 247, 605 P.2d 610, 613; see

also Zimmer-Jackson, 231 Mont. at 362, 752 P.2d at 1098 (labeling right of control "the most important factor in determining employment relationships"). It is the "right, not just the exercise, of control" that is of the utmost importance under this factor. Sharp, 178 Mont. at 424, 584 P.2d at 1301. Thus, an individual is an employee of another when that other has the right to control the details, methods, or means of accomplishing the individual's work, and not just the end result of the work. Sharp, 178 Mont. at 424, 584 P.2d at 1301; Walling v. Hardy Constr. (1991), 247 Mont. 441, 447-48, 807 P.2d 1335, 1339; Johnson v. Montana Dep't. of Labor and Indus. (1989), 240 Mont. 288, 292-93, 783 P.2d 1355, 1358; St. Regis Paper Co. v. Unemployment Compensation Comm'n (1971), 157 Mont. 548, 552-53, 487 P.2d 524, 526-27.

¶ Regarding direct evidence of right or exercise of control, the Board found in relevant part that: (1) Agrijusters provided specific training to crop adjusters to comply with the requirements and regulations of the FCIC; (2) crop adjusters were required to adjust crop losses according to FCIC procedures and regulations, and were not allowed to use their own discretion to select an alternative method to adjust crop losses; (3) trainee crop adjusters were required to satisfactorily complete both classroom and on-the-job training, often remaining under the direct supervision of experienced adjusters for up to two years before being allowed to crop adjust on their own; and (4) Agrijusters reviewed the completed work of crop adjusters and returned incomplete or erroneous work to adjusters for revision. These findings are supported by substantial evidence in the record and, therefore, are conclusive in nature. Notwithstanding these findings, the District Court reasoned that: (1) Agrijusters did not control the adjuster's day-to-day work activities; (2) Agrijusters return of insufficient or incorrect work indicates that Agrijusters controls only the end result of the adjusters' work; and (3) classroom and on-the-job training and supervision of adjusters to comply with FCIC regulations indicates control by the FCIC, not Agrijusters.

¶ While we acknowledge that there is substantial evidence in support of a conclusion that crop adjusters were not subject to close day-to-day supervision by Agrijusters (for example, adjusters could accept or reject assignments from Agrijusters and were free to choose their hours of work), we agree with the Department that the District Court improperly re-weighed the evidence in concluding that the control factor was not established. As mentioned previously, where the Board's findings are supported by substantial evidence, it is impermissible for a district court to "balance conflicting evidence in support of and in opposition to the Board's findings . . . ." Thomas Bros.,

276 Mont. at 109, 915 P.2d at 228. This is true even where " 'there is also substantial evidence or even a preponderance of evidence to the contrary.' " Gypsy Highview, 221 Mont. at 15, 716 P.2d at 623 (quoting Jordan, 114 Mont. at 343, 136 P.2d at 528). Even though there is sufficient evidence in the record for reaching opposite conclusions, we conclude that the Board's findings of fact are supported by substantial credible evidence.

¶ In Johnson, a homeowner hired carpenters to complete a remodeling project. During completion of the remodeling project, the homeowner "did not correct the carpenters as to the details in the performance of their work," and expected them to utilize their expertise to achieve his desired outcome for the project. Johnson, 240 Mont. at 292, 783 P.2d at 1358. Noting that the homeowner told the carpenters only "what he wanted done but not how to do it," this Court concluded that the homeowner "merely controlled the result" and "not the methods . . . used to accomplish the end result." Johnson, 240 Mont. at 292-93, 783 P.2d at 1358.

¶ We reach the opposite conclusion here. The findings of the Board demonstrate that Agrijusters, through training, supervision, and review of completed job assignments, substantially controlled "how" the crop adjusters performed their adjusting work. Thus, we hold that Agrijusters exercised a right of control over the means or methods by which crop adjusters completed their job assignments.

(2) Method of Payment

¶ Under this factor:

> "[p]ayment on a time basis is a strong indication of the status of employment. Payment on a completed project basis is indication of independent contractor status. Payment on a piece-work or commission basis is consistent with either status."

Walling, 247 Mont. at 449, 807 P.2d at 1339 (quoting 1C Arthur Larson, Workmen's Compensation Law § 44.33, at 8-94 (1990)).

¶ The District Court concluded that the Board's findings on the method of payment factor were not supported by substantial evidence. In so concluding, the court reasoned that:

[T]he Board found that the adjusters were paid by the hour in two-hour increments. This finding is not supported by substantial evidence, however. The adjusters testified that they were paid on a daily, not an hourly, basis. The day could be broken up into portions, but the adjusters then received payment for the portion of the day they worked. . . .

Although the adjusters were still paid on a time basis, such a method of payment is not conclusive of either an independent contractor or an employment relationship if the method is the custom in the industry. . . . The fact that adjusters were paid on a per diem basis is consistent with industry custom and does not establish that the adjusters were employees rather than independent contractors.

The court further rejected the Board's finding that adjusters were paid for correcting their work as not supported by substantial evidence, since whether or not such payment was made "depended on" the nature of the error itself and the time required to rectify it. Based on the foregoing, the District Court concluded that evidence of payment on a time basis did not necessarily indicate that crop adjusters were employees.

¶ **We disagree with the District Court. The administrative record indicates that crop adjusters were indeed paid on a *per diem* basis and, as the court acknowledged, were paid for partial days on a prorated basis. In particular, there is substantial evidence suggesting that Agrijusters compensated crop adjusters for partial days by breaking work days down into "quarters," which, assuming an eight-hour workday, clearly supports the Board's finding that adjusters were effectively paid in two-hour increments. Moreover, in concluding that the Board's finding on compensation for work corrections was not supported by substantial evidence, it appears that the District Court ignored credible testimony that crop adjusters were paid for the period of time it took to revise an inaccurate or incorrect claim <u>unless</u> the error was attributable to the individual adjuster's clear failure to follow required federal procedures in adjusting crop losses for Agrijusters.**

¶ **As noted previously, payment by a unit of time, such as an hour, day, or week, is strong evidence of employment status. <u>See</u> <u>Walling</u>, 247 Mont. at 449, 807 P.2d at 1339; 3 Arthur Larson & Lex K. Larson, <u>Larson's Workers' Compensation Law</u> § 61.06(1), at 61-12 (1999). We hold that the Board's findings on method of payment are supported by substantial evidence, and that the Board correctly concluded that**

payment of adjusters on a time basis is strongly indicative of employee rather than independent contractor status.

(3) Furnishing of Equipment

¶ Both the Board and the District Court found that crop adjusters needed only "minimal" equipment to complete their jobs (for example, a manual, a calculator, and measuring tapes or wheels), and that adjusters either provided their own equipment or leased the necessary equipment from Agrijusters for a nominal annual fee. These findings are supported by substantial evidence. However, the District Court also found that adjusters had to provide the most significant piece of equipment, a vehicle, themselves; and had to supply their own office supplies and place of business. Based on the foregoing, the District Court concluded that the record "suggests that the adjusters were independent contractors."

¶ With respect to the District Court's additional findings that an adjuster's provision of a vehicle and a place of business "suggests" independent contractor status, it appears that the court again improperly re-weighed the evidence when it should have instead concluded that the Board's findings were conclusive because supported by substantial evidence. Furthermore, there is no indication in the record that adjusters were required by Agrijusters to maintain an office or place of business, and numerous individual crop adjusters testified that they did not maintain a separate office or place of business for crop adjusting. The District Court's analysis also appears to ignore the economic reality underlying the undisputed fact that even though adjusters provided their own vehicles, Agrijusters reimbursed adjusters for any work-related mileage on their vehicles.

¶ As this Court has observed, an employment relationship "almost invariably exists" where the "employer furnishes valuable equipment." Solheim v. Tom Davis Ranch (1984), 208 Mont. 265, 273, 677 P.2d 1034, 1038 (citing 1C Arthur Larson, Workmen's Compensation Law § 44.34, at 8-95 to 8-104), overruled on other grounds by Haag v. Montana Sch. Group Ins. Auth. (1995), 274 Mont. 109, 906 P.2d 693; accord Johnson, 240 Mont. at 293, 783 P.2d at 1359. Nevertheless,"[p]roof showing a worker furnished his [or her] own equipment is not necessarily fatal to a finding of employee status." Solheim, 208 Mont. at 273-74, 677 P.2d at 1038 (citing 1C Arthur Larson, Workmen's Compensation Law § 44.34, at 8-95 to 8-104); accord Johnson, 240 Mont. at 293, 783 P.2d at 1359. Specifically, as the newest edition of the

**Larson treatise elucidates:**

> Since the furnishing even of heavy and valuable equipment by workers is frequently inadequate to establish independent contractorship, *a fortiori* very little weight is given to the furnishing by the worker of such small items as trowels, hammers and other hand tools, axes, brushes, knives, snips, and paperhanging equipment.

3 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 61.07(7), at 61-21 (1999).

¶ **We determine that this case falls within the foregoing observation. This Court has cautioned that the furnishing of equipment "test does not cut in both directions with equal force." Solheim, 208 Mont. at 273, 677 P.2d at 1038. Given the economic reality that crop adjusting requires minimal tools and our foregoing conclusions on the other Sharp factors, we hold that the furnishing of minimal equipment by crop adjusters does not necessarily indicate independent contractor status and, in fact, tends to militate in favor of employee status here.**

(4) Right to Fire

¶ **" 'The power to fire,' " as this Court has recognized, " 'is the power to control.' " Solheim, 208 Mont. at 274, 677 P.2d at 1039 (quoting 1C Arthur Larson, Workmen's Compensation Law § 44.35, at 8-116 to 8-122). The absolute right to terminate the work relationship without liability is regarded as inconsistent with the concept of an independent contractor, pursuant to which the contractor should have the legal right to complete the project under contract and to treat any attempt to prevent completion as a breach of contract. Solheim, 208 Mont. at 274, 677 P.2d at 1039 (quoting 1C Arthur Larson, Workmen's Compensation Law § 44.35, at 8-116 to 8-122).**

¶ **Concerning the right to fire, the Board found only as follows: "Either party can terminate the 'Independent Adjuster's Agreement' for any reason or for no reason by the terminating party giving ten (10) days prior written notice to the other." Thus, the Board concluded: "Absent conspicuously from the contract is any liability for termination of the 'independent adjuster' relationship." Numerous individual crop adjusters testified that they thought or believed that Agrijusters could fire crop**

adjusters at any time. However, the record is less than clear as to whether a failure to provide ten days written notice prior to termination would subject the terminating party to liability for breach of contract. The District Court reasoned in its order that "if the agreement was terminated orally or with less than ten days' notice, the terminating party breached the contract and faced potential liability."

¶ Agrijusters urges this Court to hold that, since the Board made an erroneous legal conclusion on the right to fire, the District Court owed the Board no deference with respect to the fourth Sharp factor. While the District Court's legal conclusion might well be correct, we conclude, nonetheless, that application of the four Sharp factors to the evidence in this case does not, on the whole, add up to a convincing accumulation of the evidence in favor of a conclusion of independent contractor status for Gilmore and the other similarly situated crop adjusters.

¶ In conclusion, we hold that the District Court erred in reversing the decision of the Board. Thus, we vacate the District Court's order and remand this case to the District Court for remand to the Department, with directions for entry of judgment on the Board's decision.

¶ Reversed and remanded.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ J. A. TURNAGE

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

No